FILED _____ LODGED
RECEIVED _____ COPY

SEP 0 1 2005

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ J. DEPUTY

1  Russell A. Robinson (CBN 163937)
   Application pending for admission *Pro Haec Vice*
2  Law Office of Russell A. Robinson
   345 Grove Street, First Floor
3  San Francisco CA 94102
   Telephone:    (415) 255-0462
4  Facsimile:    (415) 431-4526

5  Attorneys for Plaintiff
   GREENCRETE INC.
6

7

8

                    UNITED STATES DISTRICT COURT
9
                         DISTRICT OF ARIZONA
10
                                    CV '05  2668 PHX ROS
11  GREENCRETE INC.,                 ) No.
                                     )
12            Plaintiff,             ) COMPLAINT FOR DAMAGES,
                                     ) DECLARATORY RELIEF, AND
13  v.                               ) INJUNCTIVE RELIEF
                                     ) [Jury Trial demanded]
14  MACON COUNTY, ALABAMA,           )
                                     )
15            Defendants.            )
                                     )
16  _____)

                              **PARTIES**
17
          1.     Plaintiff GREENCRETE INC., is, and at all times was, an Arizona corporation,
18
    organized under the laws of the State of Arizona and a citizen of the State of Arizona.
19
          2.     Plaintiff is informed and believes that Defendant MACON COUNTY is, and was,
20
    a municipal corporation duly organized and existing under the laws of the State of Alabama, with
21
    its county seat in Tuskegee, Alabama.
22
                         **JURISDICTION AND VENUE**
23
          3.     This action is for damages, declaratory relief, and injunctive relief, and arises
24
    from conduct which occurred in several states.  The contract at issue was to be performed in
25

26  C-05-
    COMPLAINT FOR DAMAGES, DECLARATORY
    RELIEF, AND INJUNCTIVE RELIEF            - 1 -      ORIGINAL        05-0002\P001

THIS DOCUMENT HAS A... EN SUBMITTED ELECTRONICALLY AS REQUIRED BY THE DISTRICT OF ARIZONA'S ADMINISTRATIVE POLICIES AND PROCEDURES MANUAL

1  Macon County, in the State of Alabama, and in Maricopa County, in the State of Arizona.

2      4.    This Court has jurisdiction pursuant to 28 USC §1331 and 28 USC §1332; a

3  federal question is presented under the Constitution of the United States of America and 42 USC

4  §1983, and the parties are diverse citizens with the amount in controversy in excess of $75,000.

5  Under 28 USC §1343(a)(3), Plaintiff seeks to redress deprivations of rights secured by the

6  Constitution of the United States. An actual controversy exists and this Court is empowered to

7  grant or deny the requested relief under the Declaratory Judgment Act, 28 USC §2201.

8      5.    With regard to Plaintiff's state claims, Plaintiff has complied with all claim filing

9  and exhaustion requirements. Plaintiff's state claims were denied.

10      6.    The parties to this action executed an Agreement of October 28, 2004. In that

11  Agreement, the parties agreed that the Agreement "shall be governed by and construed in

12  accordance with the laws of the State of Arizona. Arizona shall be the place of jurisdiction for

13  any and all disputes, claims and controversies arising out of, under or in connection with this

14  Agreement. Both parties agree to submit to the personal jurisdiction of the federal and state

15  courts of the State of Arizona." Defendant has submitted to this Court's personal and subject

16  matter jurisdiction under *Argueta v. Banco Mexicano*, 87 F.3d 320 (9th Cir. 1996). By agreeing

17  to litigate this dispute in federal court, Defendant Macon County waived any immunity it may

18  otherwise have had under the 11th Amendment pursuant to relevant authorities; *e.g., McLaughlin*

19  *v. Trustees of State Colleges of Col.*, 215 F.3d 1168 (10th Cir. 2000) and *In re Inves.*, 184 F.3d

20  1275 (10th Cir. 1999). The fact that this case may be brought in the federal district court in the

21  State of Arizona was specifically negotiated by the parties and was the subject of a number of

22  discussions; this selection of venue and choice of law/choice of forum clause in the Agreement,

23  with the accompanying waiver of the 11th Amendment, were material components of the subject

24  Agreement for which Greencrete bargained.

25

26

1                         **STATEMENT OF FACTS**

2         7.      Over the course of many months, various parties entered into a series of contracts

3 by which a rubber tire recycling facility would be built in Macon County. One of these contracts,

4 between Greencrete Inc. and Macon County, was entered October 28, 2004; Greencrete promised

5 to buy "product" from Macon County. "Product" was defined as rubber buffings and recycled

6 tire rubber products which were the intended result of development, construction, and operation

7 of Macon County's rubber recycling plant. A copy of that Agreement is attached as exhibit A.

8         8.      Plaintiff is informed and believes that Jesse Upshaw, a long-time member and

9 present Chairman of Macon County's governing authority, the "Macon County Commission",

10 gave authority to William Cook, Jr., relative to carrying out pre-administrative functions and

11 review of the agreements on behalf of the Commission (including Upshaw himself), and which

12 Macon County would be entering with regard to the subject facility. Cook specifically was duly

13 authorized by and on behalf of the Macon County Commission to review and work upon the

14 formation of the various subject agreements; if the agreements were in order, Upshaw would sign

15 said agreements. On behalf of the Commission and under his apparent authority, Cook also

16 stated that Greencrete and other parties to the various agreements complied fully with their

17 obligations under the agreements; in fact, Macon County's Commission admitted that Greencrete

18 and other third-parties had complied with all conditions precedent and, as a result, as Macon

19 County Compliance Officer, Cook instructed various agreements concerning the subject facility

20 be drafted. Attached as exhibit B is a true and correct copy of Cook's October 21, 2004, letter.

21         9.      In a January 28, 2005, letter written by Macon County Chairman Pro-Tem Albert

22 Daniels, the Macon County Commission acknowledged the economic justification for building

23 the recycling plant and admitted that Macon County had the legal authority to construct the plant.

24 Further, Daniels acknowledged Macon County's "obligation to proceed with construction of the

25

26

1    recycling plant." A copy of that January 28, 2005, letter is attached as exhibit C.

2          10.    Plaintiff Greencrete Inc. did everything it was required to do under the
3    Agreement; and, in reliance on its Agreement with Defendant Macon County, Plaintiff
4    foreseeably incurred expenses and expended a considerable goodwill. Defendant Macon County
5    was informed of these efforts and expenditures almost daily as Cook and Commissioner Miles
6    Robinson were involved with the drafting of the final agreements amongst the various parties,
7    including but not limited to Rubber Mulch, Etc., Inc., a producer of mulch buffings for Du Pont
8    and Lowe's Home Improvement Stores.

9          11.    The result was a series of written agreements between Macon County and other
10   parties. These agreements are attached as exhibit D.  Greencrete Inc. was and is a third-party
11   beneficiary of those other agreements.

12         12.    After entering the Agreement with Greencrete on October 28, 2004, but before
13   acknowledging its duties on January 28, 2005, Macon County held a regularly scheduled general
14   election.  In that November 2, 2004, election, County Commissioner Tommy King replaced
15   James Cunningham and County Commissioner Andrew Thompson replaced Ernest Magruder;
16   Plaintiff is informed and believes that Ernest Magruder was and is in favor of the subject
17   recycling facility.  However, controversy surrounded that election.  An ardent opponent of the
18   subject recycling project was Commissioner Upshaw.  Upshaw ran against Harold D. Powell;
19   Plaintiff is informed and believes that at the close of the polls, ballots were torn-up, discarded,
20   and/or modified.  As a result, Plaintiff is informed and believes that Upshaw won re-election by
21   the very narrow margin of four votes.  Powell lost his challenge before the appropriate election
22   review board.  Therefore, Upshaw was able to cast the deciding vote on February 14, 2005, as
23   addressed below, and managed to scuttle the building of the subject recycling facility.

24   / / /

25

26

1      13.    On February 14, 2005, the Macon County Commission met.  Chairman Upshaw,
2  with the cooperation of the two new members, instructed new counsel to draft letters to the
3  various parties who executed agreements with Macon County, including Greencrete.  In those
4  letters, the Macon County Commission, by vote of Upshaw and the two new Commission
5  members (but not Commissioners Albert Daniels and Miles Robinson), informed these various
6  parties that Macon County will take no further action concerning the tire recycling project.  Fred
7  Gray, Sr., Macon County's new attorney, wrote the Alabama Attorney General at Upshaw's
8  request and sought opinions as to, *inter alia*, whether Macon County could set aside the vote of
9  the previous Commission and essentially walk away from the subject agreements.  Attached as
10  exhibit E and exhibit F are true and correct copies of Fred Gray, Sr.'s letter and the response
11  from the Alabama Attorney General's office, respectively.  The Alabama Attorney General's
12  office refused to offer opinions, apparently because Macon County had already acted.

13      14.    Macon County's intent to abandon the project and breach its agreements with the
14  various contracting parties was reiterated on March 3, 2005.

15                                **DAMAGES**

16      15.    As a result of the conduct by Defendant, Plaintiff suffered damages.  Over the six-
17  year period during which Greencrete had pre-sold the end product rubber and other materials, the
18  loss to Greencrete is staggering; and, that loss amounts to an aggregate of $17,832,828.  Attached
19  as exhibit G is a true and correct copy of the *pro forma* profit sheet showing these losses.
20  Attached as exhibit H is a true and correct copy of the 6-year "evergreen" contract in favor of
21  Greencrete and Macon County.  Of note is that Greencrete had agreed to pay into the Macon
22  County General Fund an additional $6 million once all four lines were operating, at $250,000
23  annually per line, not to exceed $1 million per year.

24  ///

25

26

1    16.    The conduct by Defendant Macon County forced Plaintiff to incur legal expenses,

2  costs and fees, and to retain private counsel. Plaintiff is therefore entitled to reasonable costs and

3  attorneys' fees under 42 USC §1988.

4                    **FIRST CAUSE OF ACTION**

5                          **42 USC §1983**

6    17.    Plaintiff incorporates by reference all of the preceding paragraphs as though set

7  forth fully herein.

8    18.    Plaintiff is informed that the Macon County Commission set the official policies,

9  customs, and practices for Macon County that were the moving force behind Plaintiff's

10  constitutional injuries. The deprivations violated Plaintiff's rights under the Contracts Clause of

11  the United States Constitution, Article I, section 10. By refusing, *inter alia*, to create the waste

12  authority it was required to create under its Agreement with Greencrete, Macon County impaired

13  Greencrete's rights and thwarted an essential term of that Agreement. Wyatt Haskell, Macon

14  County's bond counsel in Birmingham, Alabama, was charged with creating the authority and

15  opined that Macon County was fully authorized under the Alabama Constitution to act in the

16  manner contemplated by the various agreements.

17    19.    In cancelling the various contracts, including its Agreement with Greencrete,

18  Defendant Macon County substantially impaired Plaintiff's ability (at a loss) to comply with the

19  terms of the agreement when it instituted the official policies which breached these agreements.

20    20.    The Agreement between Greencrete and Macon County constituted a "bargain"

21  between a governmental entity and a private actor. Therefore, that "bargain" is and was a

22  contract under the Contracts Clause.

23    21.    The impairment of this contract by Macon County was substantial because it

24  deprived Greencrete of an important right; that is, Macon County thwarted performance of an

25

26  C-05-
COMPLAINT FOR DAMAGES, DECLARATORY
RELIEF, AND INJUNCTIVE RELIEF

05-0002\P001

1  essential term of the Agreement with Greencrete.  Macon County's breaches were substantial in

2  that by so acting and refusing to act, Macon County defeated Greencrete's expectations.

3  Attached as exhibit I are true and correct copies of the Term Sheet and the GMS engagement

4  letter showing, in part, the results of the hard work by Greencrete and its agents by securing the

5  funds to build the facility at $16,537,000 with a financial guarantee from an insurance company

6  that limited Macon County's exposure to any losses to a minor deductible.

7       22.    Plaintiff is informed and believe that the tortious conduct described herein was

8  known at the time by the Macon County Commission to violate Plaintiff's constitutional rights.

9       WHEREFORE, Plaintiff prays for relief as set forth below.

10                 **SECOND CAUSE OF ACTION**

11                   **BREACH OF CONTRACT**

12       23.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

13       24.    Plaintiff and Defendant, were parties to a contract, attached hereto and

14  incorporated by reference.

15       25.    In contemplation and in reliance on the above, Plaintiff did all it was asked by

16  Defendant.  Defendant breached the contract with Plaintiff by committing the acts alleged above.

17  As a direct, legal, and proximate result of the breach Defendant, Plaintiff suffered and will

18  continue to suffer foreseeable, substantial losses and damages.

19       WHEREFORE, Plaintiff prays for relief as set forth below.

20                  **THIRD CAUSE OF ACTION**

21                  **SPECIFIC PERFORMANCE**

22       26.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

23       27.    Plaintiff Greencrete and the other parties to the various contracts picked Macon

24  County for the recycling plant for many reasons.  Macon County historically is very poor, one of

25

26  C-05-
COMPLAINT FOR DAMAGES, DECLARATORY
RELIEF, AND INJUNCTIVE RELIEF        - 7 -            05-0002\P001

1  the poorest counties *per capita* in the United States.  In Macon County is Tuskegee University,
2  one of the several, historically important black universities in the United States; as part of the
3  process of building and developing the subject plant, Tuskegee would have played a pivotal role
4  in training and educating polymer science engineers and other plant employees that would have,
5  in turn, provided a mechanically-skilled work force upon which Greencrete (and Macon County)
6  could have relied to operate and maintain the subject, 52-employee facility.

7        28.     Macon County is also centrally located within the United States in terms of
8  transportation and communication.  Plaintiff and other parties to the various agreements would
9  have been able to access the subject plant and its "products" because of the ideal location the
10 Macon County plant would have provided.  Supply lines would have been ideal for shipping
11 throughout the United States; showing this plant and encouraging other cash-strapped counties to
12 build similar facilities would have been more affordable than in other places.  Macon County was
13 made aware of its unique nature as a site for this plant.

14       29.     It is altogether possible that monetary damages may not adequately compensate
15 the plaintiff for the failures by Macon County to perform.

16       30.     Plaintiff therefore sues for specific performance under its Agreement with Macon
17 County and as a third-party beneficiary under the other various agreements.

18       WHEREFORE, Plaintiff prays for relief as follows:

19                                     **PRAYER**

20       1.     Compensatory damages according to proof;

21       2.     For costs of suit and for reasonable attorneys' fees under, *inter alia,* 42 USC

22              §1988.

23       3.     For pre-judgment and post-judgment interest;

24  / / /

25

26

1      4.    For an order (a) requiring Defendant, all persons acting on behalf of Defendant

2            Macon County, to comply with the requirements of each and every agreement

3            relating to the subject recycling plant, or, in the alternative, (b) prohibiting

4            Defendant Macon County from breaching, rescinding or otherwise canceling these

5            various contracts;

6      5.    For a declaratory judgment from this Court that

7            a.    Plaintiff performed under the terms of the agreement between itself and

8                 Macon County; and,

9            b.    Defendant breached, or caused the breach, of the agreement between

10                Plaintiff and Macon County.

11     6.    For an order requiring Macon County to divest itself of sufficient resources in

12           order to fully compensate Plaintiff as required when the federal government of the

13           United States does not maintain an interest in the subject property or asset under

14           *Buchanan v. Alexander*, (1846) 45 US 20, 21.

15     7.    Such other and further relief as the Court deems just and proper.

16

17 Date: 2 August 2005                 /s/ _____

                                       Law Office of Russell A. Robinson

18                                      Attorneys for Plaintiff

                                     GREENCRETE INC.

19

20

21

22

23

24 // /

25

26  C-05-

COMPLAINT FOR DAMAGES, DECLARATORY

RELIEF, AND INJUNCTIVE RELIEF          - 9 -                 05-0002\P001

1

### DEMAND FOR JURY TRIAL

2      PLEASE TAKE NOTICE that Plaintiff hereby demands a trial by jury in this matter.

3   That is, pursuant to Federal Rules of Civil Procedure ("FRCP"), Rule 38, Plaintiff hereby

4   demands a trial by jury as is its guaranteed right.  Pursuant to FRCP, Rule 39, Plaintiff requests

5   that the matter be designated as a jury action upon the Court's docket.

6

7   Date:  2 August 2005

8                                        Law Office of Russell A. Robinson
                                         Attorneys for Plaintiff
9                                        GREENCRETE INC.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

## PURCHASE AGREEMENT

### ARTICLE 1. PARTIES.

1.1 This Purchase Agreement ("Agreement") is made and entered into as of this _____28th_____ day of OCT__, 2004, by and between Greencrete Inc., an Arizona corporation ("BUYER"), having its principal place of business at 4321 West Irwin Road, Laveen, AZ 85339, and Macon County, Alabama ("SELLER"), having its county seat at 101 E. Northside Street County Courthouse, Tuskegee, Alabama 36083-1731.  SELLER agrees to supply and BUYER agrees to purchase SELLER's products in accordance with the terms of this Agreement.

### ARTICLE 2. PRODUCT.

2.1 The term "Product(s)" as used in this Agreement means the rubber buffings and recycled tire rubber products more fully described on Exhibit 2, attached hereto and made a part of this Agreement by this reference.  The Product which will be manufactured, produced and placed in containers by SELLER, according to specifications ("Specifications") and in the quantities ("Quantities") provided by BUYER from time to time, subject to the quantity requirements set forth on Exhibit 6, both for individual Products and for all Products taken together.

### ARTICLE 3. TERM AND TERMINATION.

3.1 This Agreement shall remain in force and effect for an initial term of twelve (12) months beginning on the date of this Agreement.  Thereafter, this Agreement will continue automatically from year to year as an "evergreen contract" (such as Form 11 of Section 5.1 of West's Legal Forms by Bradford Stone(1997)), unless and until terminated by either party by giving the other party five years' written notice of termination.  Upon delivery of written notice of termination, this Agreement shall remain in force and effect for an additional five years from the date of delivery of such notice.  Both parties to this Agreement acknowledge and agree that in the context of the relationship created by this Agreement, the five year notice period for termination is reasonable and desirable.

3.2 If SELLER fails to correct any material breach of the terms hereof, within thirty (30) days after written notice by the other party, or becomes insolvent, files a voluntary petition in bankruptcy, is adjudicated a bankrupt, or an assignment is made for benefit of its creditors, this Agreement shall terminate immediately WITHOUT NOTICE, and BUYER shall only be required to take and pay for the Product produced and invoiced as of the end of the thirty (30) day notice period, or as the case may be, thirty (30) days following the event resulting in termination.

### ARTICLE 4. MANUFACTURING REQUIREMENTS.

4.1 Except as specifically provided otherwise herein, SELLER shall provide all materials, labor and overhead necessary to supply the Product to BUYER.  BUYER will provide the

1

Specifications and will either provide the containers for the Product or reimburse SELLER for SELLER's costs for the containers provided by SELLER. SELLER will package the Product in containers in accordance with the Specifications. BUYER will arrange for pickup of the Product, F.O.B. SELLER's facilities, in accordance with instructions issued by SELLER.

4.2 SELLER will be responsible for Product supply and quality control consistent with its current practice. All packing and containment of the Product for shipment shall conform to the Specifications.

4.3 BUYER shall be responsible for pickup F.O.B. SELLER's facilities, shipping and warehousing. BUYER shall ensure compliance of all shippers and warehousers with all government requirements and regulations pertaining to transportation and storage of the Product.

## ARTICLE 5. PRICES AND TERMS.

5.1 Except as otherwise provided in this Agreement, payment for the Product based on the rates set forth on Exhibit 5 constitutes SELLER's entire compensation for its performance hereunder and includes all required quality control procedures and all services required by SELLER to perform this Agreement.

5.2 BUYER will pay SELLER for the Product at the rates set forth on Exhibit 5, attached hereto and made a part of this Agreement by this reference.

5.3 SELLER's invoices shall be payable by BUYER, cash on delivery, F.O.B. SELLER's facilities, prior to loading and delivery. SELLER will invoice BUYER based on the amount of Product supplied by SELLER for such delivery, F.O.B. SELLER's facilities, and title and risk of loss will pass upon completion of delivery and issuance of such invoice to BUYER.

## ARTICLE 6. QUANTITY OF PRODUCT.

6.1 BUYER acknowledges that SELLER is currently in the process of planning and constructing its manufacturing facilities. Until completion of the manufacturing facilities and commencement of manufacturing ("Commencement Date"), SELLER shall have no obligation to sell and BUYER shall have no obligation to buy Products. Beginning on the Commencement Date, SELLER will sell to BUYER, and BUYER will buy from SELLER, the amount of Product set forth on Exhibit 6, attached hereto and incorporated herein by this reference, during each successive twelve (12) month period beginning and ending on the Commencement Date or anniversaries of the Commencement Date, as the case may be and as contemplated in the Pro Forma available at www.usmd.cc ("Pro Forma"). SELLER shall notify BUYER of the Commencement Date in writing as soon as SELLER determines it, which date will be added in the space provided on Exhibit 6 at that time.

6.2 Notwithstanding anything in this Agreement to the contrary, SELLER shall not be

2

obligated to provide Quantities of Product specified by BUYER that would exceed those called for on Exhibit 6, or are that would be beyond SELLER's then current production capacities.

## ARTICLE 7. INDEPENDENT CONTRACTOR.

7.1 In the performance of this Agreement, SELLER and BUYER are independent contractors, and neither SELLER nor BUYER, nor any of their respective  employees and agents shall be considered an employee or agent of the other.  Neither SELLER nor BUYER can bind or obligate the other.

## ARTICLE 8. PATENTS, PROCESSES, TRADEMARKS AND INTELLECTUAL PROPERTY.

8.1  BUYER agrees that nothing in this Agreement shall give it any right, title or interest in any patents, processes, trademarks or other intellectual property owned or licensed by SELLER (other than such intellectual property, if any, licensed from BUYER) which may be used on or in connection with the Products.  Any labels or description of processes appearing on or in the Product, containers, packing materials or Material Safety Data Sheets, are solely for SELLER's performance under this Agreement.  If BUYER wants SELLER to use any of BUYER's patents, processes, trademarks, trade secrets or other intellectual property owned or licensed by BUYER ("BUYER's Intellectual Property Rights")in connection with manufacturing the Products, BUYER and SELLER agree to negotiate in good faith a commercially reasonable license agreement or nondisclosure agreement to protect BUYER's interest in BUYER's Intellectual Property, provided that to the extent BUYER's Intellectual Property is in the public domain, such an agreement will not remove any right SELLER would have to BUYER's Intellectual Property absent such an agreement.

## ARTICLE 9. WARRANTY AND REGULATORY MATTERS.

9.1 Except as set forth in Exhibit 9, attached hereto and made a part of this Agreement by this reference, and Section 2.1 of this Agreement; NO WARRANTY, EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, IS BEING GIVEN TO BUYER WITH RESPECT TO THE PRODUCT; AND, ANY AND ALL SUCH WARRANTIES, INCLUDING, WITHOUT LIMITATION, WARRANTY OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, ARE HEREBY DISCLAIMED.

9.2 SELLER's Product is produced and supplied in conformity with federal, state and local laws and governmental regulations applicable to ground tire rubber recycling, and shall be supplied in accordance with the Specifications.

3

181

## ARTICLE 10. INDEMNITY.

10.1 SELLER shall defend, indemnify, save and hold harmless BUYER and its employees, officers, and directors ("Seller Indemnified Party") from and against any and all claims, damages, liabilities, or expenses, including reasonable attorneys' fees, for violations of governmental laws and regulations involving the process employed by SELLER in supplying the Product; except SELLER shall have no duty under this Agreement to defend, indemnify and hold a Seller Indemnified Party harmless against and from any and all claims or actions for injuries or damage to property or persons, due to the negligence or willful misconduct of a Seller Indemnified Party.

10.2 BUYER shall defend, indemnify, save and hold harmless SELLER and its employees, officers, and directors ("Buyer Indemnified Party") from and against any and all claims, damages, liabilities or expenses, including reasonable attorneys' fees, arising or alleged to arise, in whole or part, from any use and sale of the Product by BUYER as a component material of any of BUYER's products; except BUYER shall have no duty under this Agreement to defend, indemnify and hold a Buyer Indemnified Party harmless against and from any and all claims or actions for injuries or damage to property or persons, due to the negligence or willful misconduct of a Buyer Indemnified Party.

## ARTICLE 11. FORCE MAJEURE.

11.1 Neither party shall be liable to the other for any default or delay in delivering or accepting Product, if such default or delay results from any cause beyond the reasonable control of the party whose performance is affected, including acts of God or government, acts of war, riots or other civil disorders, strikes or labor disputes or slow-downs, fires, floods, embargoes, earthquakes, wind storms, blizzards, shortages or scarcity of material or fuel or any other similar cause to those enumerated and not the fault of the party whose performance is affected. The party whose performance is affected by an event of force majeure shall notify the other party in writing, if possible, and as soon as practicable of the event or condition hindering or preventing its performance and shall make reasonable efforts to minimize the hindrance of such condition.

11.2 If SELLER is unable to supply BUYER in a timely manner, whether due to force majeure or otherwise, BUYER shall be released from performance of this Agreement, only to the extent necessary to supplement its Product requirements from other sources.

## ARTICLE 12. CHOICE OF LAW AND JURISDICTION.

12.1 This Agreement shall be governed by and construed in accordance with laws of the State of Arizona. Arizona shall be the place of jurisdiction for any and all disputes, claims and controversies arising out of, under or in connection with this Agreement. Both parties agree to submit to the personal jurisdiction of the federal and state courts of the State of Arizona. In the event of a lawsuit or other action in which depositions are to be taken, both parties consent to holding each deposition at the offices of the attorneys of the party requesting the deposition, or such other location the requesting party chooses.

4

## ARTICLE 13. AMENDMENT OR WAIVER.

13.1 This Agreement may be amended, and any provisions hereof waived by either party only in writing signed by an authorized representative of the party against whom such amendment or waiver is sought to be enforced.

## ARTICLE 14. ASSIGNMENT.

14.1 SELLER may not assign this Agreement without the consent of the BUYER in writing.  BUYER may assign this contract without the consent of SELLER.

## ARTICLE 15. ENTIRE AGREEMENT

15.1 This Agreement contains the entire agreement and understanding on the subject between BUYER and SELLER, and no representations, promises, agreements or understandings, written or oral, not contained herein shall be of any force and effect.

## ARTICLE 16. NOTICE.

16.1 Any notice required or permitted to be given under this Agreement must be in writing and will be deemed given upon receipt when hand delivered, sent certified or registered mail, return receipt requested, or when sent by expedited courier service, in each case addressed as follows:

If to SELLER:

If to BUYER:

Name:   Macon County Commission
Address: 101 E. Northside St.
Tuskegee, AL 36083

GreenCrete, Inc
4321 West Irwin
Laveen AZ 85339

Fax:

Fax:

Attn:  Jesse L. Upshaw, Chairman

Attn: Robert Konopke

With a copy to Optionee's attorney:

Name:  Downey Brand
Address: 555 Capitol Mall, 10th Floor
Sacramento, CA  95814
Fax: (916) 444-2100

Attn: John C. Oehmke

## ARTICLE 17. HEADINGS.

17.1 Headings contained in this Agreement are included for convenience only and form no part of the agreement between the parties.

## ARTICLE 18. BINDING EFFECT.

18.1 This Agreement shall be binding upon and inure to the benefit of the parties and the successors and assigns of the parties hereto.

## ARTICLE 19. SURVIVAL.

19.1 No termination of this Agreement, either with or without cause shall release either party hereto from their obligations contained in the following Paragraphs, which shall survive such termination: 8.1, 9.1, 10.1, 10.2, 12.1, 19.1.

Acknowledged and agreed to as of the date first set forth above.

SELLER:

Macon County Commission
Name: Macon County, Alabama

By: _____
Name: Jesse L. Upshaw
Title: Chairman

BUYER:

GreenCrete, Inc.

By: _____
Name: Robert Konopka
Title:

6

## Exhibit 2

## Products

### Description:

1. 6-10 mesh crumb rubber

2. 10-30 mesh crumb rubber

3. 30-60 mesh crumb rubber

4. Under 60 mesh crumb rubber

5. Buffings

7

## Exhibit 5

### Prices*

| <u>Description</u> | <u>Price</u> |
|---|---|
| 6-10 mesh crumb rubber | $0.13/lb. |
| 10-30 mesh crumb rubber | $___/lb. |
| 30-60 mesh crumb rubber | $___/lb. |
| Under 60 mesh crumb rubber | $___/lb. |
| Buffings | $___/lb. |

*This Agreement contemplates that SELLER will pay BUYER $9,360,000 per twelve (12) month period for 72,000,000 pounds of Product predicated on the Pro Forma, assuming that BUYER purchases 6-10 mesh crumb rubber. The prices of the other Products listed above are set so that SELLER will receive an additional amount per pound for such Products to compensate it for the additional cost incurred for production of such Products.

8



# Macon County Commission



William (Bill) Cook Jr.
Compliance Officer
101 E. Northside St. - Rm.102
Tuskegee, Alabama 36083

Phone (334) 724-2554          Fax (334) 724-2621          E-mail: wcook4@hotmail.com

October 21, 2004

RE: Items to be included in the GMS Group Engagement Agreement
With the Macon County Commission

Dear Mr. Saling:

Enclosed herein is the "Agreement between SCS Engineers and Macon County, Alabama, For Professional Services," along with "the Tire Feasibility Planning Study," to which you are in receipt of by way of Robert Gardner of SCS Engineers.

As a part of the agreement under Article 5 – Compensation, "the designated third-party" is TESC, "the third-party." As such, we the Macon County Commission as called for in the Planning Study, agree to be bound by the provisions of sections 1.0, 1.1, 1.1.1, 1.1.2, and to be bound by all other sections of the planning study as it applies to the Macon County Commission.

This shall include all other sections of the Tire Recycling Facility Feasibility Study; file number 01204048.00 developed for Macon County by SCS Engineers dated October 8, 2004. Each Macon County Commissioner is in receipt of the SCS Engineers above mentioned file number study. Enclosed, find to be attached to your GMS Group engagement agreement for Macon County, the following: this letter dated October 21, 2004 over my signature and the contract agreement between SCS Engineers entered into and dated May 10/12, 2004.

Regards,

William (Bill) Cook Jr.
Compliance Officer

B

187



THE STATE OF ALABAMA
## Macon County Commission
Macon County-Courthouse
Tuskegee, Alabama 36083



Governing Body of Macon County
Jesse L. Upshaw
Chairman
Commissioner Miles D. Robinson
District 1
Commissioner Albert Daniels
District 2
Commissioner Andrew D. Thompson, Jr.
District 3
Commissioner Tommy Lee King
District 4

(334) 727-5120 • Fax: (334) 724-2621

January 28, 2005



Robert B. Gardner, P.E., DDE
Senior Vice President
SCS Engineers
330 N. Center Drive
Bldg. 13-Suite 100
Norfolk, VA 23502

Re: Macon County Recycling Plant

Dear Mr. Gardner:

The Macon County Commission acknowledges that the Tire Recycling Facility Feasibility Study prepared by SCS Engineers substantiates the economic justification of the recycling plant project described in the study. As explained in the legal opinion letter of Haskell Slaughter, a copy of which is enclosed, the Macon County Commission has the legal authority to construct the recycling plant through a solid waste disposal authority. The Commission acknowledges our obligation to proceed with the construction of the recycling plant. The Commission also understands the scope of work associated with the additional tasks set forth on page 5 of the agreement between Macon County and SCS Engineers, dated April 23, 2004, and have affirmatively voted as a body to approve the additional tasks. The Commission has reviewed the list of contractors set forth on the Exhibit of Contractors and request that you cause the preparation of contracts with those contractors. When preparation of the contracts is complete, a solid waste disposal authority working as an agency of Macon County will enter into contracts with the parties set forth on the exhibit as well as any other parties that are necessary for completion of the recycling plant, and will proceed with the recycling plant's construction pursuant to the contracts and as described in part in the feasibility study.

Very truly yours,

Albert Daniels,
Macon County Chairman Pro-Tem

43069.1

C

188

SCS Project No. _____

## AGREEMENT BETWEEN SCS ENGINEERS AND MACON COUNTY, ALABAMA FOR PROFESSIONAL SERVICES

**THIS AGREEMENT** (hereafter "Agreement") is made by and between <u>Macon County, Alabama</u> (hereafter to as "Client" or "County"), and SCS Engineers (hereafter "SCS").

**WHEREAS,** Client intends to engage SCS to perform professional services for a project known as <u>Facility Planning Study for Scrap Tire Processing Facility</u> (hereafter "Project").;

**NOW, THEREFORE,** Client and SCS do hereby agree as follows:

**ARTICLE 1—SCOPE OF SERVICES.**

SCS shall provide professional services (hereafter "Services") as set forth in the proposal, dated April 6, 2004, in accordance with the terms and conditions of this Agreement.

**ARTICLE 2—RESPONSIBILITIES OF THE CLIENT.** Client will:

2.1  Provide all criteria and full information as to its requirements for the Project.

2.2  Furnish SCS with data, reports, surveys, and other materials and information required for the Project, except such of the foregoing as are included in the Services to be provided by SCS.

2.3  Acquire all land and rights-of-way as required for the Project.

2.4  Provide access to the Project site and make all provisions for SCS to enter upon public and private lands as required for SCS to perform its Services under this Agreement.

2.5  Examine all studies, reports, sketches, construction costs, specifications, drawings, proposals and other documents presented by SCS to Client, and promptly render in writing Client's decisions pertaining thereto within a week, or, if a longer time is needed, within a period mutually agreed upon.

2.6  Give prompt written notice to SCS whenever Client observes or otherwise becomes aware of any defect in the Services rendered by SCS.

2.7  Furnish to SCS, prior to execution of this Agreement, a copy of any design, construction or other standards Client requires SCS to follow in performing Services under this Agreement.

2.8  Provide to SCS all budget requirements, if any, applicable to the Services and the Project.

D

1

## ARTICLE 3--CHANGES IN THE SERVICES.

3.1  Changes may be made to the Services. Client may order additional Services upon the agreement of SCS. Client may delete previously ordered Services.

3.2   The provisions of this Agreement, with an equitable adjustment in SCS' compensation and schedule, shall apply to all changes in the services.

3.3  All changes to the Services shall be made pursuant to a Change Order form.

3.4  In the event Client directs SCS to perform changed Services without executing a Change Order form, SCS shall be compensated for the changed Services in accordance with SCS' then current standard rates, unless otherwise agreed in writing by the Parties.

3.5  If changes are requested by the County, which result in an increase in project fees, those additional costs would be absorbed by the County.  The costs for any changes would be covered by the general obligation bond if the project moves forward.  If the project does not move forward, the party requesting the change would be liable for the cost increase.

## ARTICLE 4--PROJECT SCHEDULE.

4.1  The parties will mutually agree upon a schedule for performance of the Services ("Project Schedule").

4.2   SCS will begin performance of the Services upon Client's performance of all such Client responsibilities, as set out in Article 2, which are reasonably required in order for SCS to begin and perform the Services in accordance with the Project Schedule.

## ARTICLE 5—COMPENSATION.

For the Services as set forth in the Scope of Services, SCS shall be compensated as set forth below. Changes to the Services under Article 3 shall be compensated at SCS' then current standard rates unless otherwise agreed in writing by the parties.

☐   5.1 SCS will be compensated for time and expenses in accordance with SCS' standard rates in effect at the time of performance. Copies of SCS' current rates are attached. These rates are subject to adjustment on January 1 and June 30 of each year.

☐   5.2 SCS will be compensated in the lump sum amount of $_____.

☒   5.3 Other: SCS will be compensated as follows:

2

146

With the execution of a contract with SCS, the County agrees to pay $10,000 in a lump sum payment within 30 days of contract execution. Another $10,000 will be paid within 30 days of contract execution by one of the various companies being considered for inclusion in the project (e.g., Granutech Saturn, ABB, URS, etc.) or other involved parties, such as Four D Corporation, which operates an existing plant of this type ("the designated third-party"). The remaining $18,000 will be deferred until the County makes a final decision as to whether it will move forward with the project or not, although this deferral period shall not last greater than 90 days after completion of the facility planning study.

If the facility planning study successfully demonstrates the viability of the project and the County moves forward with the project, the County agrees to reimburse all parties for the entire $38,000 through the bond proceeds. If the facility planning study successfully demonstrates the viability of the project but the County does not move forward with the project, the County will bear no additional financial liability. In that case, the designated third party above will then reimburse SCS for the remaining $18,000 within 30 days of the County's decision not to move forward with the project.

Please note that all projects costs will ultimately be reimbursed through floating of the general obligation bond if the project moves forward.

## ARTICLE 6--PAYMENT.

Payment for Services rendered by SCS shall be in accordance with the following:

6.1  Invoices will be submitted by SCS every month and will indicate:

(a) for time and expenses compensation, the time and expenses incurred during the period.

(b) for lump-sum compensation, the percentage of work completed during the period.
(c) for other compensation: _____

6.2  Client will pay the sum of $ 10,000 within 30 days of the execution of this Agreement as a professional retainer. This sum shall be applied as a credit to Client on SCS' final invoice for Services under this Agreement.

6.3  Payments for invoices issued by SCS are due and payable upon receipt.

6.4  Payments due SCS under this Agreement shall be subject to a service charge of one and one-half (1-1/2) percent per month for invoices not paid within thirty (30) days after the date of receipt of invoice.

6.5  If Client does not make timely payments, SCS may suspend performance of its Services on the basis of non-performance on the part of Client. When all amounts due are paid and adequate assurances of payment are given for all Services which have been rendered but not yet invoiced, as well as all future Services, SCS will continue its Services.

6.6  Client agrees to pay all costs and expenses of SCS, including reasonable attorney fees, arising out of or in connection with collecting amounts for which Client is responsible pursuant to this Agreement

3

## ARTICLE 7--INSURANCE.

SCS shall, during the performance of this Agreement, keep in force Workers' Compensation Insurance, including Employer's Liability Insurance for its employees, and Commercial General Liability Insurance with a combined minimum limit of $1,000,000 for bodily injury and property damage.

## ARTICLE 8--LIMITATION OF LIABILITY.

8.1 This Article 8 states the agreement of the parties with respect to allocation of the risks inherent in the type of project undertaken herein. The parties agree that SCS' liability under this Agreement and for the Project shall be limited to the amount covered, if any, by SCS' liability insurance then in effect, or the amount of SCS' total fees hereunder (whichever is greater).

8.2 If Client desires that SCS assume more of the risk under this Agreement and for the Project than is specified in Article 8.1, and is willing to compensate SCS for the greater assumption of risk then in consideration of Client paying a surcharge in addition to the compensation specified in Article 5, SCS' total liability under this Agreement can be increased.

## ARTICLE 9-- RELEASE AND INDEMNIFICATION.

9.1 It is understood and agreed that, in seeking the Services of SCS under this Agreement, the Client may be requesting SCS to undertake obligations for the Client's benefit involving the presence or potential presence, or release or potential release to the environment, of hazardous substances and other contaminants. Therefore, Client agrees that SCS will not be responsible for, and does hereby release, hold harmless, indemnify, and defend SCS from and against any and all claims, losses, damages, liability and costs, including but not limited to costs of defense, arising out of or in any way connected with the presence, discharge, release or escape of hazardous substances or contaminants of any kind, excepting only such liability as may arise out of the sole negligence of SCS.

9.2 Except as provided in Article 9.1 above, and to the extent provided in Article 8 above, SCS shall indemnify and hold harmless Client from and against any liabilities, claims and causes of action which Client may suffer as a result of negligent acts, errors, or omissions, or the willful and reckless disregard of obligations under this Agreement on the part of SCS or SCS' agents, employees or subcontractors in the performance of this Agreement, excepting such liability as may arise out of Client's negligence.

## ARTICLE 10--GENERAL PROVISIONS.

10.1 SCS will perform its Services hereunder, as specified in Attachment A, in a timely manner. SCS is not responsible for delays occasioned by factors beyond its control, nor by factors, which could not reasonably have been foreseen at the time this Agreement was executed.

10.2 SCS shall be entitled to rely on information provided by Client. SCS shall be entitled to an equitable adjustment in the price and schedule if conditions differ materially from information provided by the Client, or differ materially from what reasonably could have been anticipated given the nature of the Services.

10.3 SCS shall perform its Services in accordance with the professional standards applicable to the Services provided (i.e., engineering, planning, consulting or others), at the time such Services are rendered. SCS makes no other warranty, either expressed or implied, as part of this Agreement.

4.

10.4   SCS shall not disclose, or permit disclosure of any information designated by Client as confidential, except to its employees and other consultants who need such information in order to properly execute the Services of this Agreement. This provision shall not apply to information which: (1) has been published and is in the public domain, (2) has been provided to SCS by third parties who have the legal right to possess and disclose the information, (3) was in the possession of SCS prior to the disclosure of such information to SCS by Client, (4) is required by law or any governmental agency to be disclosed, or (5) would require disclosure to comply with the ethical obligations of SCS to protect the public.

10.5   Statements made by SCS concerning probable construction costs and detailed cost projections represent SCS' judgment with respect thereto. It is recognized, however, that SCS has no control over actual site conditions, the cost of labor, materials, or equipment, a contractor's methods of determining bid prices, or over competitive bidding or market conditions. Accordingly, SCS cannot and does not represent or guarantee that bids or ultimate Project costs will not vary from any statement of probable construction cost or other cost projection prepared by SCS.

10.6   All drawings, specifications, reports, notes and data developed pursuant to this Agreement are instruments of service, and as such the original documents are and remain the property of SCS.

10.7   If construction at the site is to be performed by a person other than SCS, Client agrees to require such person to assume sole and complete responsibility for job site conditions during the course of construction, including safety of all persons and property. SCS shall have no responsibility for site health and safety for anyone other than its own employees and its subcontractors, unless SCS expressly has agreed to provide such services. Client agrees SCS shall not be responsible for and does hereby release, hold harmless, indemnify and defend SCS from and against all claims, losses, damages, liability and costs, including costs of defense thereof, arising out of or in any way connected with performance of construction work by persons other than SCS and its subcontractors.

10.8   To the extent specifically provided in the Services, SCS will be available for advice and consultation, and will monitor on a limited basis construction work performed by persons other than SCS. SCS accepts no responsibility and makes no warranty whatsoever that construction work performed by other persons meets the design specifications (this being the sole responsibility of Client) unless the Services provides specifically for SCS to assume such responsibility. In no event shall SCS be responsible for the means, method or manner of performance of any persons other than SCS or its Subcontractors.

10.9   At no time shall title to hazardous substances, solid wastes, petroleum contaminated soils or other regulated substances pass to SCS, nor shall any provision of this Agreement be interpreted to permit or obligate SCS to assume the status of a "generator," "owner," "operator," "transporter," "arranger," or "treatment, storage or disposal facility" under state or federal law.

## ARTICLE 11--TERMINATION OF AGREEMENT.

This Agreement may be terminated by either party upon thirty (30) days written notice to the other party without cause; by mutual written agreement of the parties; or by either party with five (5) days written notice to the other in the event of continuing substantial failure to perform in accordance with the terms hereof by the other party through no fault of the terminating party. If this Agreement is terminated, SCS shall be paid for all Services performed by SCS to the effective date of termination. The indemnities of Article 9 and Article 10 shall survive any termination of this Agreement.

## ARTICLE 12—DELEGATION OF DUTIES; ASSIGNMENT; SUCCESSORS.

Neither party shall delegate its duties under this Agreement without the written consent of the other party. Each party binds itself to the successors, administrators and assigns of the other party in respect of all covenants of this Agreement.

## ARTICLE 13—EXTENT OF AGREEMENT.

This Agreement represents the entire and integrated agreement between Client and SCS and supersedes all prior negotiations, representations, or agreements, either written or oral, for Project. In the event any provision of this Agreement is determined to be invalid, the remaining provisions of this Agreement shall continue in full force and effect.

## ARTICLE 14 – PARTIES TO AGREEMENT.

For the purposes of this Agreement, the term "SCS Engineers" shall mean SCS Engineers P.C. for projects in New York and North Carolina, and Stearns, Conrad and Schmidt Consulting Engineers, Inc. for all other projects.

## ARTICLE 15 – PROJECT SPECIFIC CONDITIONS.

By executing a contract with SCS for completion of the facility planning study, the County is also agreeing to the following conditions:

- The County has adopted a resolution that has passed by a majority vote of its County Commission indicating should the facility planning study substantiate the economic justification for the project (such being a one-line but not to exceed four lines recycling facility generating $2,829,000 gross revenue and $1,178,000 net revenue at an installation cost not to exceed $3,875,000 per line), the County will proceed with construction of the plant

- If the County decides to move forward with the project based on the results of the facility planning study, the County agrees that it would enter into additional contractual arrangements for SCS to move forward with the following additional tasks, pending County approval of the additional scope of work:

    o Assistance with obtaining the U.S.D.A. loan guarantee of 90%.
    o Facility siting, design and permitting
    o Procurement assistance for construction
    o Construction management
    o Plant operations and management
    o Overall project management

SCS will initiate work under this agreement upon receipt of a signed contract with the County and a fully executed agreement with the designated third party for payment of the residual amount of the project fee beyond the County's obligations.

150

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized representatives as of last date written below.

MACON COUNTY, ALABAMA:

BY: _____

NAME: JESSE L. UPSHAW
CHAIRMAN

TITLE: MACON COUNTY COMMISSION

DATE: May 10, 2004

SCS ENGINEERS:

BY: _____

NAME: Patrick S. Sullivan

TITLE: Vice President

DATE: 5-12-04

7

151

# GRAY, LANGFORD, SAPP, McGOWAN, GRAY & NATHANSON

ATTORNEYS AND COUNSELLORS

P.O. BOX 830239
104 WEST NORTHSIDE STREET
TUSKEGEE, ALABAMA 36083-0239
(334) 727-4830
Fax (334) 727-5877

March 18, 2005

FRED D. GRAY*
CHARLES D. LANGFORD
ERNESTINE S. SAPP
WALTER E. McGOWAN
FRED D. GRAY, JR.**
STANLEY F. GRAY***
ALLAN NATHANSON***
BRIDGETT VASSER GRAY

ALSO LICENSED:
*OHIO
**DISTRICT OF COLUMBIA
***ARIZONA

THE BAILEY BUILDING, #205
400 SOUTH UNION STREET
MONTGOMERY, ALABAMA 36104
(334) 262-1942
FAX (334) 262-2039

Hon. Troy R. King, Esq.
Attorney General
State of Alabama
11 S. Union St., FL 4
Montgomery, AL 36130-2120

RE:    Request For Attorney General's Opinion by the
       Macon County Commission

Dear Mr. King:

This office serves as County Attorneys for the Macon County Commission (the Commission). This letter is written pursuant to a Resolution of the Commission wherein it requests that the County Attorneys request an Attorney General's Opinion concerning actions taken by the County Commission with reference to certain agreements entered into by the Commission and others with reference to the Commission establishing, operating, and financing a tire recycling plant. The specific opinions requested are contained in the latter part of this letter.

Introduction

Macon County (the County) is an economically depressed county in the State of Alabama at the eastern end of the Black Belt. While some areas of the State are growing and developing economically, Macon County has not sustained that type of economic development even though Montgomery County to the west, Lee County to the east, and Elmore and Tallapoosa Counties to the north and west have shown substantial economic growth and development. In an effort to obtain economic growth in the county in terms of jobs and revenue for the county, the Commission is very receptive to various proposals with reference to establishing businesses and plants in the county that would generate jobs for the residents and revenue for the county.

The Facts

In late 2002 or early 2003 a Mr. James E. Moore, who indicated he was Overseer, Vicariatus Urbis Corporation Sole, and Director/Vice Chairman, Vicariatus Urbis Foundation, Ltd, 980 9ᵗʰ St., 16ᵗʰ Floor, Sacramento, CA 95814, began communicating

E

Exhibit A

Hon. Troy King
March 18, 2004
Page 2

with Mr. Jesse Upshaw, Chairman of the Macon County Commission. Mr. Moore stated
to Chairman Upshaw that he was in the business of assisting counties in depressed areas
in establishing plants that would provide jobs and revenue. He also stated he had
experience in establishing tire recycling plants and wanted to interest the Commission in
owning, operating, and maintaining a tire recycling plant. The components produced at
the plant would be sold, thus creating jobs for residents, and millions of dollars in
revenue to the county. He indicated that Macon County was a typical place for such a
plant, and the Commission could float tax exempt bonds to finance the project. Mr.
Moore also initially stated that Farmers Home Administration would guarantee the
payment of the bonds. Subsequently, James E. Moore came to the meeting of the Macon
County Commission, presented his proposal with reference to such a tire recycling plant,
and as a result, over a period of time, the Commission participated in the following
activities which the Commission believed, at that time, would be of benefit to the county
and bring millions of dollars in revenue while creating jobs:

1.    A proposal was presented to the Commission from SCS Engineers, Sacramento,
      California, including estimated fees for a facility planning study for a scrap tire
      processing facility to be built in Macon County, Alabama. Attached hereto,
      marked as Exhibit 1 is a letter of SCS Engineers dated April 23, 2004 with
      Attachment 1, SCS Standard Fee Schedule. Based on that proposal, an agreement
      was entered into between SCS Engineers and Macon County, Alabama dated
      May 10, 2004 and May 12, 2004. This agreement is marked as Exhibit 2. The
      agreement was authorized by action of the Macon County Commission in its
      meeting on May 10, 2004, a copy of the minutes of the Commission is marked as
      Exhibit 3.

2.    The Commission paid to SCS the sum of Ten Thousand Dollars ($10,000.00) for
      the feasibility study. A copy of the Commission minutes of January 12, 2004
      authorizing this payment is attached as Exhibit 4. According to the terms of that
      agreement, if the feasibility study was favorable, then SCS Engineers would be
      employed by the Commission to construct and operate the facility. On October
      25, 2004, Mr. Bob Gardner of SCS Engineers made a report on the favorability of
      constructing such a plant in Macon County. According to the report, the
      feasibility study was favorable. A copy of said report is dated October 8, 2004 and
      marked as Exhibit 5. At said meeting, the Commission accepted the report and
      authorized the execution of the agreement. The Chairman of the Commission
      expressed his opposition to the project. Also at said meeting, the Commission
      engaged Wyatt Haskell to serve as County Representative for the project. A copy
      of the minutes of the Commission of October 25, 2004 is marked as Exhibit 6.
      Subsequently, Mr. Haskell rendered his opinion to the Commission dated
      December 20, 2004, a copy of which is marked as Exhibit 7.

Hon. Troy King
March 18, 2005
Page 3

3.   James B. Moore caused Carl A. Saling of the GMS GROUP to make a proposal to
     the Commission, with respect to financing the project. A copy of the Term Sheet
     for Macon County, Alabama Tire Recycling Plant is marked as Exhibit 8. Based
     on the proposal, the Commission entered into an agreement with the GMS Group
     LLC dated October 26, 2004, a copy of which is marked as Exhibit 9. The
     agreement was authorized at a meeting of the Macon County Commission on
     October 25, 2004 as is reflected on pages 1 and 2 of the minutes of the
     Commission, a copy of which is attached as Exhibit 6.

4.   A purchase agreement between Greencrete, Inc., an Arizona Corporation, as
     Buyer, and Macon County, Alabama as seller was entered into on October 28,
     2004 for the sale of rubber products to be produced by the plant. Among other
     things, this agreement specifically states on page 4 of Article 12 that this
     agreement shall be governed by and construed in accordance with the laws of the
     State of Arizona. A copy of this agreement is marked as Exhibit 10.

5.   During the General Election of November 2, 2004, the residents of Macon County
     elected two new Commissioners. Commissioner Tommy King replaced James
     Cunningham and Commissioner Andrew Thompson replaced Ernest Magruder.

6.   On October 21, 2004, William (Bill) Cook, Jr., Compliance Officer for Macon
     County wrote a letter to Mr. Saling of GMS Group concerning the Engagement
     Agreement with the Commission, a copy of which is marked as Exhibit 11.

7.   Subsequent thereto, on January 28, 2005 Mr. Albert Daniel, Macon County
     Chairman Pro-Tem wrote a letter to Mr. Robert Gardner, Sr. Vice President of
     SCS Engineers with reference to the recycling plant, a copy of which is attached
     hereto as Exhibit 12.

8.   The Macon County Commission met on February 14, 2005 and took the
     following actions: (a) retained the law firm of Gray, Langford, Sapp, McGowan
     Gray and Nathanson as County Attorneys (b) instructed the county attorneys to
     draft a letter to the various parties who executed agreements with the
     Commission, informing them that the Commission will take no further action
     concerning the tire recycling project. A copy of the Commission minutes of
     February 14, 2005 is marked as Exhibit 13.

9.   Subsequent to the Commission action of February 14, 2005, the following
     correspondence was sent or received in connection with this project:

Hon. Troy King
March 18, 2005
Page 4

     (a)    A letter dated February 24, 2005 addressed to Mr. Jesse L. Upshaw and
Fred Gray, Sr., Esq. from Russell A. Robinson, Esq., on behalf of
Greencrete, Inc. and TESC, expressing its concern about "....there may
be some interest on the part of some commissioners in canceling plans to
construct the recycling plant." A copy of that letter is marked as Exhibit
14.

     (b)    A letter dated March 3, 2005, from counsel for the Commission to the
parties informing them that the Commission would discontinue any further
action toward the Macon County Commission being involved in a
proposed tire recycling plant in Macon County, Alabama, marked as
Exhibit 15.

     (c)    A letter dated March 11, 2005 from Maria Crimi Speth, Esq. to Fred D.
Gray, Esq. on behalf of Greencrete, Inc., expressing concern that the
Commission decided not to continue with the project and threatening legal
action, marked as Exhibit 16.

     (d)    A letter dated March 14, 2005 from Robert Konopke, President,
Greencrete, Inc., to Chairman Upshaw, all Commissioners, and William
(Bill) Cook, Jr., Compliance Officer, with a copy to Fred D. Gray and
Robert Gardner, requesting that the Commission confirm its intention to
abide by the terms of Greencrete, Inc.'s contract with the Commission,
marked as Exhibit 18.

10.    The Commission on March 14, 2005 adopted a Resolution requesting this
Attorney General's Opinion, a copy of the Resolution is marked as Exhibit 18.

Questions Presented For Opinions.

    Based upon the facts presented in this letter, exhibits attached thereto, the
applicable laws and Constitution of the State of Alabama, the Commission requests your
opinions on the following questions:

1.    Did the Commission have legal and constitutional authority to enter into the
various contracts that are described above?

2.    If so, are said contracts legally binding upon the Commission and is the
Commission legally compelled to complete the project according to the terms and
conditions of said contracts?

Hon. Troy King
March 18, 2005
Page 5

3.      What is the legal effect of the action taken by the Macon County Commission on
        February 14, 2005 in which it decided to take no further action concerning the
        establishing, operating, and maintaining the recycling plant?

4.      Did the Macon County Commission have the legal authority to decide not to
        proceed further with the proposed recycling plant on February 14, 2005, given the
        previous Commission's action authorizing execution of the contracts?

5.      What are the duties and responsibilities, if any, of the Commission to the various
        parties to the contracts in view of the action taken by the Commission on
        February 14, 2005?

6.      Is the Commission legally obligated and constitutionally bound to proceed with
        the construction and maintenance of the project?

7.      Can the Commission be legally sued in state or federal courts in the State of
        Arizona to enforce the various contracts in which it entered in connection with
        this project?

8.      Can the Commission be legally compelled to defend suits initiated in state or
        federal courts in the State of Arizona to enforce the various contracts in which it
        entered in connection with this project?

        If you have any questions concerning this matter, or if you prefer, I will be happy
to come to your office and discuss this matter with the person who is assigned to write
the opinion.

        Thank you for your assistance in connection with this matter.

                        Very truly yours,



                        Fred D. Gray

FDG:j

Jun 03 05 11:02a      James E. Moore          915 914126          p.19
MAY 31 2005 11:24 AM F. SHLLM BINGHAM.   334 426 3115    H0605151845141256 P.00



**STATE OF ALABAMA**
**OFFICE OF THE ATTORNEY GENERAL**

TROY KING
ATTORNEY GENERAL

ALABAMA STATE HOUSE
11 SOUTH UNION STREET
MONTGOMERY, AL 36130
(334) 841-7300
www.AGO.STATE.AL.US

May 12, 2005

Honorable Myron Penn
Member, Alabama State Senate
Post Office Box 5335
Union Springs, Alabama 36089

Dear Senator Penn:

This letter is in response to your request on behalf of the Macon County Commission ("Commission") concerning various questions relating to a contract between the Commission and a private entity. Based on the information provided by the Honorable Fred Gray, the Macon County Commission has entered into the contract in question.

The Attorney General is authorized to provide opinions to public officials and public bodies with respect to an official duty that requires immediate performance. ALA. CODE § 36-15-1 (2001). Opinions may not be issued for the purpose of reviewing actions that have already been taken. As stated above, the Commission took actions to enter into the contract, but has recently notified the parties that it is terminating the contract.

The information presented from the county shows that the county has been advised by a private attorney that the county does not have the authority to enter into the contract as presented, but may enter into the contract through a waste authority that could be created by the county. A clause in the agreement also indicates that the agreement may be terminated, without cause, by either party upon 30-days written notice to the other party.

I regret that this Office is unable to provide you with an opinion. If you have any questions, please do not hesitate to contact me.

Sincerely,

TROY KING
Attorney General
By:

*Brenda F. Smith*

BRENDA F. SMITH
Chief, Opinions Division

TK/BFS

194132v1/78788

** TOTAL PAGE.03 **

F

## Macon County, AL Plant - Pro-Forma Profit Sheet

| Product | Sale Price (per/lb) | Volume LBS. | Total Sales | County Price (per/lb) | Total County Revenue | Shipping (per/lb) | GC Profit (per/lb) | GC Profits |
|---|---|---|---|---|---|---|---|---|
| 1. Rubber Mulch | 0.165 | 18811000 | 3103815 | 0.13 | 2445430 | 0.012 | 0.023 | 432653 |
| 2. Asphalt Rubber | 0.125 | 9405600 | 1175887.5 | 0.08 | 752440 | 0.012 | 0.033 | 310381.5 |
| 3. Nylon&Steel | ALL PLANT PRODUCTION | | | 383570 | 383570 | 0 | | 0 |
| Total Per Year Per Line | | | 4279502.5 | | 3581440 | | | 743034.5 |
| X 4 LINES - ACCELERATED DEBT FIGURE | | | 17118040 | | 14325760 | | | 2972138 |
| X 6 YEARS | | | 102708060 | | 85954560 | | | 17832828 |

1. Rubber Mulch, ETC., LLC.
2. Blackledge Emulsions, Inc.
3. New York Waste or Ellman Recycling Center

4. $250,000 yearly per line to the Macon County general fund X 4 lines X 6 years = $6,000,000

07-19-2005 16:06   GREENCRETE INC 5709523649   PAGE2



# RUBBER MULCH ETC.

REUSE
REDUCE
RECYCLE

November 17, 2004

James E. Moore
Overseer, Vicariatus Urbis Corporation Sole
Director/Vice Chairman, Vicariatus Urbis Foundation, LTD.
GPERS Chief of Staff – Pro Bono
980 9th. Street, 16th. Floor
Sacramento, CA 95814
Phone: (916) 449-9686    Fax: (916) 491-4126

Mr. William "Bill" Cook
Compliance officer
Macon County Alabama
101 East Northside Street, Room 102
Tuskegee, AL 36083
Phone: (334) 201-6766  Fax: (334) 724-2621

RE: Rubber Buffings Purchase Agreement

Dear Sirs:

Per my conversation of the morning with principally, James E. Moore and Norma
J. Nichols, his Administrative Assistant, as well as Robert Konopke of
Greencrete, Inc. I wish to confirm to all understanding those salient points of the
morning telephone conference call.

Given my fourteen years of experience as Director of Distribution for General Tire
& Rubber Company (now Continental Tire) for their Charlotte, NC and Waco, TX
operations distributing 20 million tires annually; fourteen years as Administrator
for two major chemical companies; and three years nine months as owner of my
present limited liability company specializing in the sales and distribution of
products derived from waste tires, I offer the following as regards the purchase of
a specific recycled tire product to be manufactured by the general obligation
bond, proposed Macon County Alabama Tire Recycling Plant.

- The specified product being a +4 tire buffing;
- Such +4 buffings derived from the literal grinding off of tire tread from
  either a semi-truck tire or passenger car tire; and
- Said buffings to reflect a size of approximately 1/16-1/32" thickness x
  1" width x1.5-2" length.

H

Should the Macon County Tire Recycling facility be able to produce this product to the specificity listed above, I, hereby agree under the following terms to purchase said +4 buffings in the amount Macon County can produce under its operational plan. Its operational plan is to process truck or car tires, not to exceed, 1,447,000 car tires and presently an unknown amount of truck tires; car tires processing of one line, not to exceed four lines per year;

- To pay sixteen and one-half cents ( $ .165) per pound delivered;
- Purchase in either 2,000 pound "supersacks" or by bulk "blown-in" truckloads;
- My understanding is that thirteen cents ( $ .13) of this purchase amount goes directly to Macon County and that the construction of said recycling facility to the requested specificity will take thirteen months from March 6, 2005 or sooner depending on construction;
- To purchase "for an initial term of 12 months and will continue automatically from year-to-year as an 'evergreen contract' unless and until terminated by either party (Rubber Mulch, Etc., LLC or Macon County Tire Recycling Plant) upon five years written notice"; and
- Written as a non-transferable, non-cancelable, Irrevocable Agreement to Purchase.

In support of my inquiry and interest, please understand that Rubber Mulch, Etc., LLC has entered into a long-term contract, effective April 2005, to provide Lowe's 1,100 home improvement stores with bagged decorative mulch made from the aforementioned +4 buffings, such as could be manufactured at the Macon County Tire Recycling facility given the ability to purchase such machinery to do so.

Further, I recommend to you the contacting of buffing machinery manufacturer, Cincinnati Retread, Cincinnati, OH, Al Penter, Owner, (513) 829-2248 or US manufacturer's representative for an Australian buffing machine manufacturer, Rubber Wholesalers, Ranger GA, Terry Harris, Owner, (706) 334-2331.

I look forward to a completion of our discussion(s) by hearing from your contract counsel, Mr. John C. Oehmke of the law offices of Downey Brand, LLC, (916) 444-1000 for the formal drafting of a Rubber Mulch, Etc., LLC, Agreement to Purchase wherein such Agreement can be executed by both Rubber Mulch, Etc., LLC and Macon County.

Sincerely,

John Booker, Partner, CEO
E-mail: rubbermulch@abts.net
Phone: (866) 437-8989   Cell: (704) 650-9015   Fax: (828) 437-8997
Copy: All Macon County Board of Supervisors
         John C. Oehmke, Esq.

2



*1489 Baltimore Pike ◼ Building 200, Suite 245 ☐ Springfield, Pennsylvania 19064*

## TERM SHEET
## MACON COUNTY, ALABAMA
## TIRE RECYCLING PLANT

Macon County is exploring the opportunity of building a tire recycling plant as a means to increase local employment and tax revenue in the County.

Tire recycling is an environmental necessity. Unlike most rubbish which eventually finds its way to a land fill, recycled tire products are used in many ways that actually improve the environment. Additionally if tires are not recycled they become an environmental hazard.

Today's Energy Solutions Corp. (TESC) is the developer of the project. SCS Engineers will provide facility siting, design, permitting, construction management, plant operations and overall project management. Granutech – Saturn Systems will provide the processing equipment to convert whole scrap tires into high quality crumb rubber.[1]

It has been experience that the formula for a successful recycling facility is as follows:

- Well known and experienced manufacturer of the processing equipment.

    Granutech – Saturn Systems has been manufacturing high quality state of the art "turn key" scrap tire reduction systems since 1987. They have been in the manufacturing of recycling systems since 1965. Granutech has designed and installed some of the largest recycling facilities in the industry.

- Plant construction, operations and management.

    Since 1970 SCS Engineers, employee owned, has provided high quality professional engineering and scientific services in the environmental and conservation industries. SCS has a world wide reputation having completed solid waste, landfill gas, site remediation, privatization, and other environmental projects in over 40 countries since the 1970s, in Latin America, the Middle East, Asia-Pacific, Europe, and Canada.

- Assured product to be recycled.

    TESC is in the process of negotiating long term commitments such as Goodyear and other tire manufacturers to supply product. Additional negotiations are underway with independent haulers to assure supply, should there be an unforeseen interruption of product by one of the main suppliers.

- Assured purchasers of recycled product.

    Crumb rubber is a commodity and is bought and sold as such. Greencrete, Inc. is one of the largest suppliers of crumb rubber to the recycled market. Greencrete has offered an "evergreen contract" with a minimum termination notice of 5 years and will post a Performance Bond.

The Feasibility Study presents a four line project with a two phase development of the facility. Two "lines" initially being installed and two additional lines installed within 2 to 3 years. Each line will cost approximately $3,510,000 for a total four line facility of $16,480,000.

This could present difficulties for a fixed rate single term financing. There would have to be two financings to accommodate the two phase development plan. That creates two financing costs and possible interest rate risk.

For this reason and also since the majority of the facilities revenue will go toward retiring the outstanding principal of the debt, we are proposing a General Obligation Taxable Variable Rate Demand Note (VRDN). A VRDN would not have an optional call premium to retire the principal as fast as possible. Fixed rate

---

[1] See SCS Engineers, Tire Recycling Facility Feasibility dated October 8, 2004

*Macon County, Alabama   VRDN*
*Page 2*

single term notes can have early optional call premiums of up to as much as 106%. The VRDN would have a "stated maturity" but could be paid down at any time.

The Note Interest Rate would be based upon a 30 day taxable interest rate. Presently, a Note of this type is paying approximately 2.5% to 3.5%.

The Note would be issued "up to" (approximately $16,480,000) the full amount of the project but would only actually issue the debt as needed. It would resemble a line of credit. The initial two lines costing approximately $7,200,000 would be issued immediately. As they come on line and begin to produce revenue the principal would begin to be paid down. When phase two is ready an additional amount would be issued to cover the financing of the two additional lines. The full "up to" amount will probably never be issued because the initial two lines will be paying down principal before phase two.

As a General Obligation financial insurance would be very inexpensive and the rating agencies would assign a "AAA" rating to the financing. A Letter of Credit would also be secured through the financing to provide the 30 day liquidity and interest rate reset.

<u>Approximate Cost of Issuance:</u>

* All Costs of Issuance will be financed from the proceeds of the Note.
    Rating Agencies : $20,000 to $25,000
    Financial Insurance (MBIA or FITCH)  One time 50 basis points.
    Letter of Credit:  50 basis per year.
    Legal fees:  Underwriter's Counsel, Issuers Counsel, Bond Counsel : $120,000
    GMS fee: 2.25%
    Remarketing Fee:  $1.00 per $1,000 per year of outstanding principal.

<u>Financing Process:</u>

* Approximately 90 days.
    Total time from Engagement to Note Closing.

<u>Example of Debt Service:</u>

* See Attachment - A
* Assumptions used in Attachment
    3% constant interest rate
    Interest only till 12/01/06 during construction period and "on line".
    Each line produces $1,178,000 net revenue per year.
    All four lines are operational by 12/01/06.
    The County is receiving $1,000,000 revenue by 12/01/06.

Please contact me for further discussion.

Very truly yours

*Carl A. Saling*

Carl A. Saling

172

October 26, 2004

Macon County Court House
The Macon County Board of Commissioners
C/o Jesse Upshaw, Chairman
William Cook, Compliance Officer
101 East Northside St.
Tuskegee, AL  36083

> Re:   Underwriter and Re-marketer for a General Obligation, Tax-exempt Variable Rate
> Demand Note, issued by the County of Macon, Alabama for the purpose of constructing
> a Solid Waste Recycling Facility (the Facility) in an existing building located in the City
> of Tuskegee, Alabama and to be further secured by the revenues derived by the County
> through the revenues derived through the Facility.

Dear Honorable Chairman Upshaw:

After a review of the information provided to The GMS Group, L.L.C. ("GMS"), GMS hereby offers, subject to the terms and conditions set forth in this letter agreement, ("Agreement") pursuant to County Resolution # _____, (: attached) to act as Underwriter and Re-marketer for the tax-exempt financing for the above referenced Transaction for The County of Macon, Alabama, its affiliates, successors and assigns (collectively, the "Borrower"). It is expected that the proposed Notes will be issued by The Macon County Solid Waste Authority ("Issuer") with a Pledge of all revenues of the Issuer and further secured by the Full Faith and Credit of the Borrower and other sureties as described in the Term Sheet.

GMS agrees to make a firm commitment to underwrite and re-market the tax-exempt Note issue (the "Notes") as Variable Rate Demand Notes (VRDN) with a liquidly Letter of Credit issued through an acceptable Financial Institution, at market rates and terms, to finance the Transaction, assuming a successful pricing of the Notes, the County, assisted by the Underwriter, will secure an Interest Rate Cap Agreement not to exceed 6% per annum through an acceptable Financial Institution and provided that the conditions described in this Agreement are satisfied and the proceeds of the tax-exempt Notes are used for the sole purpose to finance a Solid Waste Recycling Facility for the purpose of recycling tires ("Facility"). This firm commitment would be evidenced by the execution of a Note Purchase Agreement ("NPA") setting forth the interest rates, principal amortization and redemption terms of the Notes and would include such terms and conditions to closing as are acceptable to GMS and its Counsel. The NPA would be accompanied by, among other things, a letter of representation and indemnity agreement from the Borrower.

Upon acceptance of this Agreement by the Borrower, the Borrower grants GMS the exclusive right to place any and all debt for the Transaction for a period of One Year (1 year) beginning from the date this Agreement is executed by the Borrower, unless such date is extended by the Borrower and GMS in writing. The Borrower agrees that it will use its commercially reasonable efforts to facilitate the underwriting of the Notes by GMS within the terms of this Agreement, including, without limitation, cooperating with GMS and diligently pursuing any necessary approvals and consents. Thereby, GMS agrees that it will facilitate the underwriting and re-marketing of the Notes.

Borrower Initial _____

GMS Initial _____

174

As consideration for underwriting the Notes on the terms and subject to the conditions of this Agreement, an underwriter's fee ("Underwriter's Fee") equal to Three and One Quarter Percent (3.25 %) of the principal amount of the Notes; funded in the Note proceeds to the extent allowable, not to include an Underwriters Discount, if any, shall be paid to GMS at closing, payable if and only if the closing on the Notes occurs, and such Underwriter's Fee shall represent the total underwriter's fee regardless of whether GMS forms a syndicate to assist in selling the Notes.

As consideration for re-marketing the Notes on the terms and subject to the conditions of this Agreement, a re-marketing fee equal to .25% ( $2.50 per Thousand ($1,000)) of the then outstanding balance will be due from the Borrower to GMS, payable annually in advance on the Dated date of the Note issue.

In addition to any Underwriter's Fee, the Borrower shall pay when due, and GMS shall not be responsible for the payment of, any and all costs of issuance of the Notes (as contracted by the Borrower with each party or as approved in advance by the Borrower), including, but not limited to, Borrower's counsel fees and expenses, Issuer's fees and expenses, Issuer's counsel fees and expenses, Trustee's fees, Trustee's counsel fees and expenses, GMS counsel fees and expenses, bond counsel fees and expenses, preliminary offering document and final offering document printing fees, bond printing fees, title insurance and land survey fees, appraisal fees and environmental study fees. In addition, the reasonable expenses incurred by GMS in connection with the financing, including business class travel and other out of pocket expenses, shall be reimbursed to GMS by Borrower at the time of the closing on the Notes; such reimbursement is contingent upon the closing on the Notes.

In addition to other conditions herein specified, GMS's obligations pursuant to this Agreement are subject to the following conditions: (i) the proceeds of the Notes shall be used for the cost of installing the Facility; (ii) the Notes shall be secured by the Full Faith and Credit / General Obligation Pledge of the Borrower, but not limited to, all revenues derived therefrom; (iii) the Notes shall be issued in minimum denominations of $5,000 and integral multiples of $5,000 thereof; and (iv) the Facility shall continue to be managed by the Borrower and or through a management contract between the Borrower and an Operator approved by the Borrower, Underwriter and Trustee.

The closing on the Notes, and GMS's agreement to act as Underwriter for the Notes, shall also be subject to certain other conditions listed below and the preparation, approval, execution and delivery of legal and other documentation in form and substance satisfactory to GMS and its counsel, including, but not limited to, the following (and all opinions, letters and certificates to be delivered at the closing on the Notes shall be addressed to GMS and the Trustee):

1)      All Resolutions and Documentation related to the issuance of the Notes, and Borrower's obligations in connection therewith, including, without limitation, a Trust Indenture, a Financing Agreement in the form of a Loan Agreement, Lease or Installment Sale Agreement, Note, a Preliminary and Final Offering Documents, a Note Purchase Agreement (including a Letter of Representation and Indemnity Agreement of the Borrower and other exhibits commonly included therein) and other documents and certifications commonly associated with the issuance of tax-exempt Notes, all containing such terms, covenants, warranties, representations and remedies as are acceptable to GMS and its counsel;

2)      An opinion of bond counsel acceptable to GMS, satisfactory in form and substance to GMS and its counsel, that interest on the Tax-Exempt Notes will be treated as

Borrower Initial _____          GMS Initial _____

The County of Macon, Alabam
10/27/2004
Page 3 of 5

excludable from gross income for Federal Income Tax purposes, that the Notes are legal, valid and enforceable instruments (subject to a customary bankruptcy and equitable remedies exception) and such other opinions as are rendered customarily by bond counsel in similar transactions;

3)  An opinion of counsel to GMS satisfactory in form and substance to GMS, to the effect that: (a) the offering document for the Notes does not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading, (b) the sale of the Notes is exempt from the registration requirements of the Securities Act of 1933, as amended, and it is not necessary to qualify the 1999 Indenture, as amended, under the Trust Indenture Act of 1939, as amended, and (c) such other matters as are usually required to be covered in such an opinion in similar transactions or as are reasonably requested by GMS;

4)  An opinion of counsel to Borrower acceptable to GMS, satisfactory in form and substance to GMS and its counsel, to the effect that, under the law governing the applicable documents: (a) the Borrower is a Municipal Government exempt from taxation under the Internal Revenue Codes, (b) all necessary documents required to be executed by Borrower have been duly authorized and executed by, are valid and binding obligations of, and are duly enforceable against Borrower (subject to a customary bankruptcy and equitable remedies exception); (c) Borrower has all necessary licenses, permits and approvals to acquire, construct, equip, own, and operate the Facility; (d) the information in the Offering Document with respect to the Borrower, the Facility, the Transaction and Noteholder's Risks does not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading; and (e) such other matters as are usually required to be covered in such an opinion in similar transactions (including customary no conflict, no litigation and security interest opinions) or as are reasonably requested by GMS or its counsel;

5)  The approval, execution and delivery of all bond, note and closing documents by the Issuer, Trustee, and Borrower, including, without limitation, all in form and substance acceptable to GMS and its counsel;

6)  A current Environmental Phase 1 Report for the Property, meeting ASTM standards from a firm acceptable to GMS and in form and substance satisfactory to GMS and its counsel;

7)  An appraisal for the Facility from an MAI appraiser acceptable to GMS and in form and substance acceptable to GMS and evidencing that upon completion of the Facility the fair market value of the Facility will be at least equal the aggregate principal amount of the Notes.

8)  Evidence that no litigation or regulatory action is in existence as of the date of closing which if decided adversely to the Borrower or any entity which directly controls or is controlled by the Borrower, would have a material adverse effect on the financing or ownership of the Property by the Borrower;

Borrower Initial _____

GMS Initial _____

9) A financial report, in form and substance satisfactory to GMS, evidencing the ability of the Borrower to pay the operating expenses of the Facility, and provide debt service coverage for the Notes at a level acceptable to the market;

11) GMS shall be satisfied in its sole discretion with its due diligence review to include any and all contracts relating to the operation of the Facility and GMS's credit committee shall be satisfied with its review and shall have approved the placement of the Notes;

12) All due diligence materials requested by GMS or its counsel shall have been timely delivered;

13) Title insurance policy for the Facility totaling the principal amount of the Notes evidencing that the Borrower has good and marketable title to the Facility, and an ALTA land survey of the Facility, with accompanying surveyor certificate, zoning endorsement and such other endorsements as requested by GMS or its counsel, all satisfactory in form and substance to GMS and its counsel;

14) Evidence acceptable to GMS to the effect that (i) the Facility will comply with all state and federal wetlands, environmental and historic preservation laws; (ii) the storm water and sewer discharge from the Facility will comply with all federal, state and local laws; and (iii) such other environmental matters as shall be requested by GMS and its counsel;

15) At Closing, the Borrower if necessary shall make an equity contribution to the Transaction, which the Underwriter would assist the County to secure, through a Taxable borrowing, in an amount sufficient to cover all costs of issuance not permitted by law to be paid by the tax exempt series Note proceeds and any Transaction costs not paid out of all Note proceeds;

16) Such additional legal opinions, Resolutions, certificates, instruments and other documents as GMS or its counsel may reasonably request.

Should for any reason the Borrower not comply with the above terms and conditions which would prevent the closing of the Note issue, the Borrower agrees pay a Disengagement Fee of Twenty Thousand Dollars ($20,000.00) within Thirty Days (30) of such event to GMS plus all legal and out of pocket expenses incurred by GMS relating to this Transaction.*

*As it relates to the above paragraph of #16, beginning with the word "Should for any reason" and ending with the word "Transaction," it is agreed by the borrower and the GMS Group that this paragraph is stricken from this engagement agreement in its entirety and shall not apply to the borrower.

Initial

This Agreement embodies the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and supersedes all prior oral or written agreements and understandings relating to the subject matter hereof. No statement, representation, warranty, covenant or agreement of any kind not expressly set forth in this Agreement shall affect, or be used to interpret, change or restrict, the express terms and provisions of this Agreement. The terms of the Agreement can only be modified in writing signed by GMS and the Borrower and no purported oral modification shall have any effect. This Agreement shall be governed by the laws of the State in which the Borrower and Facility is located or any applicable Federal law without giving effect to the choice of law provisions thereof.

Borrower Initial

GMS Initial

The County of Macon, Alabr
10/27/2004
Page 5 of 5

This Agreement may be executed in any number of counterparts, each of which shall constitute an original of this Agreement and together shall constitute a single instrument.

If you find the terms of this Agreement acceptable, please sign below and return a copy of this Agreement to GMS. We at GMS look forward to working with you on this financing.

Very truly yours,

**THE GMS GROUP, LLC**

By:_____
Carl A. Saling
Senior Vice President

Accepted and agreed to this _____ day of _____, 2004

For: **THE COUNTY OF MACON, ALABAMA: FOR THE COUNTY OF MACON, ALABAMA SOLID WASTE DISPOSAL AUTHORITY**, and its affiliates, successor and assigns

Jesse Upshaw
Chairman

(SEAL)

Additional Signatories if necessary:

(NOTARIZED)

Borrower Initial _____          GMS Initial _____

178